**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY MILLER, | |
| Plaintiff, | |
| -against- | **23-cv-6649 (FPG)** |
| THE COUNTY OF MONROE, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE COUNTY OF
MONROE'S MOTION TO DISMISS**

ROTH & ROTH, LLP
Elliot D. Shields
*Attorneys for Plaintiff*
192 Lexington Avenue, Suite 802
New York, New York 10016
(212) 425-1020
eshields@rothandrothlaw.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS …………………………………………………………..……...……… i

TABLE OF AUTHORITIES …………………………..…………………………...…….…… iv

PRELIMINARY STATEMENT …………….…..…………………………………..…………... 1

PERTINENT FACTS ………………………………………………...……………… 2

LEGAL STANDARDS …………………………………………………...……...……… 7

    **I.**    **Motion to Dismiss**………………………………………………..……… 7

    **II.**    ***Monell* Liability**……………………………………………..……… 7

ARGUMENT ……………………………………………………....……............ 9

  **I.**    **Defendants Cannot Introduce Extra Pleading Materials To Contradict Facts Pled in the Complaint**…………………………………………..……… 9

  **II.**    **Widespread practice and/or *de facto* policy of failing or refusing to seek out, collect, or track exculpatory and impeachment evidence, or, alternatively, of suppressing material exculpatory and impeachment evidence in their possession and control.** …………………………………………………… 10

      **A. The Court's decision in Owens with respect to a *de facto* policy**…………….. 9

      **B. Mr. Miller's complaint pleads important additional facts that were not pled in Mr. Owens' complaint, and thus this Court's decision in Owens should not be controlling with respect to the *de facto* policy theory of municipal liability**.. 11

  **III.**    **This Court's decision in *Owens* is controlling and demonstrates that Mr. Miller's complaint adequately pleads that the DA's Office was deliberately indifferent to constitutional violations committed by trial prosecutors under a failure to discipline theory of municipal liability**…………………………………………… 15

  **IV.**    **Mr. Miller's complaint adequately pleads that the DA's unlawful policies caused his wrongful conviction**……………………………………………… 16

      **a. The basic requirements for showing a constitutional *Brady* violation**……… 17

      **b. The County's argument that the failure to disclose Wengert's Investigative Action Report regarding his use of the Find My iPhone application was the fault of the police, and not the prosecutor, is meritless** ………………………… 18

**c. The prosecutor's failure to timely disclose Wengert's Investigative Action Report constituted a *Brady* violation because it deprived Mr. Miller of an opportunity to obtain evidence regarding the victim's cell phone for use in the trial.**………………………………………………………………………...**20**

**d. The prosecutor's failure to disclose the RPD Officers' radio communications constituted a *Brady* violation because they could have been used to impeach the RPD officers and they would have provided the defense with alternative strategies.** ……………………………………………………………….……… **21**

**CONCLUSION** …………………………………….……………………...……….……….... **25**

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                 **Pages**

*Anderson News, LLC* v. *Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ……………..………………………………………….…….7

*Arista Records, LLC* v. *Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ……………..……………………………………….…….7

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ……………..…………………………………………..……………7

*Bellamy* v. *City of New York*,
    914 F.3d 727 (2d Cir. 2019) ……………..……………………………………..………8

*Brady* v. *Maryland*,
    373 U.S. 83 (1963) ………..……………………..………..…….…..…….… *passim*

*Cone v. Bell*,
    556 U.S. 449 (2009) ………..……………………..………..…….…….…….…18

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ………..……………………..………..…….…….…..…….9

*Davis* v. *City of New York*,
    228 F.Supp.2d 327 (S.D.N.Y.2002), *aff'd,* 75 Fed.Appx. 827 (2d Cir.2003) ………..…..8

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) ………..……………………..………..…….…..…….9

Doe v. Columbia Univ.,
    831 F.3d 46 (2d Cir. 2016) ………..……………………..………..…….…..…..…...9

*Giglio* v. *United States*,
    405 U.S. 150 (1972) ………..……………..………………..…….…..…..…….… *passim*

*Graves v. Dretke*,
    442 F.3d 334 (5th Cir. 2006) ………..……………..………………..…….…..…...…..22

Grievance Comm. for the Tenth Judicial Dist. v. Kurtzrock (In re Kurtzrock),
    138 N.Y.S.3d 649 (2 Dept 2020) ………..…………..……………………..……....…..19

*Hines* v. *Albany Police Dep't*,
    520 Fed.Appx. 5 (2d Cir.2013) ………..………..……………………..……....…...9

*Jett* v. *Dallas Indep. Sch. Dist.,*
    491 U.S. 701 (1989) ……..……….……………………..…….…..……..………..8

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ……..……….……………………..….….…..…..…… 18, 19, 20, 22

Leka v. Portuondo,
    257 F.3d 89 (2d Cir. 2001) ……..……….……………………..…….…..……..………..20

*Matusick* v. *Erie Cnty. Water Auth.,*
    757 F.3d 31, 61–62 (2d Cir.2014) ……..……….……………………..…….…..……. 9

*McCarthy v. Dun & Bradstreet Corp.,*
    482 F.3d 184 (2d Cir. 2007) ……..……….……………………..…….…..……..……...9

*McMillian* v. *Monroe Cty.,*
    520 U.S. 781 (1997) ……………….……………………..…….…..……..…….…………7

*Missel* v. *County of Monroe,*
    351 Fed.Appx. 543 (2d Cir.2009) ……..……….……………………..…….…..……..9

*Monell* v. *City of New York, ,*
    436 U.S. 658 (1978) …………………….……………………..…….…..……..……… *passim*

*Nnodimele v. DeRienzo,*
    13-CV-3461 (ARR)(RLM) (E.D.N.Y. Jan. 27, 2016) ………………....……………20

Owens v. The Cnty. of Monroe,
    No. 21-CV-6445-FPG (W.D.N.Y. Dec. 27, 2021) …………………….…….…….. *passim*

*Parker* v. *City of Long Beach,*
    563 Fed.Appx. 39 (2d Cir.2014), *as amended,* (Apr. 21, 2014) …………….…………9

*People v. Casalino,*
    204 A.D.3d 1078 (3 Dept 2022) ……..……….……………………..…….…….…..20

*People v. Davis,*
    174 A.D.3d 1538 (4 Dept 2019) ……..……….……………………..…….…….…..6

*People v. Fuentes,*
    12 N.Y.3d 259 (2009) …………………….……………………..…….…..……..….17

*People v. Garrett,*
    23 N.Y.3d 878 (2014) …………………….……………………..…….…..……..….17

*People v. Hunter,*

11 N.Y.3d 1 (2008) …………………..…………………..……...…..…..……….…..18

*People v. Jackson*,
    237 A.D.2d 179 (1 Dept 1997) …………………..…………………..…….…..…19

*People v. Miller*,
    134 N.Y.S.3d 605 (4 Dept 2020) …………………..…………………..……...6, 23

*People v. Negron*,
    26 N.Y.3d 262 (2015) …………………..………………..……....……………... 17

*People v. Simmons*,
    36 N.Y.2d 126 (1975) …………………..…………………..……..……………...19

*People v. Smith*,
    127 A.D.2d 864 (2 Dept 1987) …………………..………….……..……..……...22

*People v. Ulett*,
    33 N.Y.3d 512 (2019) …………………..…………………..……...……...……..22

*People v. Vilardi*,
    76 N.Y.2d 67 (1990) …………………..…………………..……..……...…...17, 22

*People v. Wright*,
    86 N.Y.2d 591 (1995) …………………..…………………..……..……………...19

*People v. Zuhlke*,
    67 A.D.3d 1341 (4 Dept 2009) ………………….……..………….……..……...6

*Poventud v. City of N.Y.*,
    750 F.3d 121 (2d Cir. 2014) …………………..………………..…….…..… 18, 23

*Ramos* v. *City of New York*,
    285 A.D.2d 284 (1st Dep't 2001) ……..…………………..…….…..…..………8

*Roth* v. *Jennings*,
    489 F.3d 499 (2d Cir.2007) …………………..…………………..……..……..…9

*Sira* v. *Morton*,
    380 F.3d 57 (2d Cir. 2004) ……..…………….……………..……..…….….……9

*Schnitter* v. *City of Rochester*,
    556 Fed.Appx. 5, 2014 WL 494893 (2d Cir.2014) ……………………………...9

*Strickler v. Greene*,
    527 U.S. 263 (1999) …………………..………………….……..…….…..………17, 19

*Torraco v. Port Auth. of N.Y. & N.J.,*
    615 F.3d 129, 140 (2d Cir.2010) ……..…………….…………….….……...……..……….8

*U.S.  v. Agurs*,
    427 U.S. 97 (1976) ………………….…………………….……..……..…..…...18, 25

*U.S. v. Avellino*,
    136 F.3d 249 (2d Cir. 1998) …………………….…………………….……..……...…22

*U.S. v. Bagley*,
    473 U.S. 667 (1985) ……………….……………………….……..……..……..17, 22

*U.S. v. Garner*,
    507 F.3d 399 (6th Cir. 2007) …………………….……………….……...….…...…20

*U.S. v. Meregildo*,
    920 F. Supp. 2d 434 (S.D.N.Y. 2013) ……………….…...……….……..……….20

*U.S. v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012) ……………….……………………….…..…………...18

*U.S. v. Rodriguez*,
    496 F.3d 221 (2d Cir. 2007) …………….…..……………….…..…………...17

*Vann* v. *City of Rochester,*
    No. 18-cv-6464, 2019 WL 1331572 (W.D.N.Y. Mar. 25, 2019) ……………….……13-14

*Vill. of Freeport & Andrew Hardwick v. Barrella*,
    814 F.3d 594 (2d Cir. 2016) …………………………….….…..…....……..……….2

*Walker* v. *City of New York,*
    974 F.2d 293 (2d Cir. 1992) …………………………….….…....……..…...……….8

Wearry v. Cain,
    577 U.S. 385 (2016) …………………………….…..….…...…..…….……………18

Youngblood v. West Virginia,
    547 U.S. 867 (2006) …………………………….…..….…...…..…….……………18

**Statutes**                                                                                          **Pages**

42 U.S.C. § 1983 ………………………………………….…..……………......… *passim*

**Rules**                                                                                               **Pages**

N.Y. Rules of Prof'l Conduct 3.3(a)(2)…………………….…..……………....... ..… 2

**<u>Other Sources</u>**                                                      **<u>Pages</u>**

Gary Craig, *Proof of police dishonesty leads to overturned conviction. Many more could follow*, Democrat & Chronicle (Sept. 5, 2021) …………………………………………………………13

**Preliminary Statement**

In *Owens v. The Cnty. of Monroe*, No. 21-CV-6445-FPG (W.D.N.Y. Dec. 27, 2021), this Court granted in part and denied in part the County of Monroe's motion to dismiss the Plaintiff's *Monell* claim. Relevant here, the Court considered Plaintiff's *Monell* claim to have been pled under two theories of municipal liablity: first, a "widespread practice" theory of municipal liability, which alleged "a *de facto* policy of refusing to disclose *Brady* material and presenting false and misleading evidence and testimony at trial", *id*. at *7; and second, a *failure to discipline* deliberate indifference theory of municipal liability, as demonstrated by the D.A.'s failure to disciple prosecutors who were found to have committed prosecutorial misconduct. *Id*. at *9-11. Importantly, the Court held, "while Plaintiff's *Monell* claim fails under a widespread practice theory, it survives under a theory of failure to discipline and Defendant's motion on this ground is DENIED." *Id*. at *11.

Here, Plaintiff's complaint similarly alleges *Monell* liability based on a (1) widespread practice theory of a "de facto policy of ignoring and suppressing, rather than disclosing, *Brady* evidence" ECF 1 ¶¶ 118, 119-137; and (2) deliberate indifference based on "a policy, practice, and custom of failing or refusing to internally investigate, reprimand, sanction, or discipline prosecutors for misconduct." *Id*. ¶¶ 138, 139-167.

Here, *Owens* is controlling with respect to the deliberate indifference failure to discipline theory of municipal liability, since the factual allegations here are substantially identical and even more fulsome than those pled in *Owens*. However, *Owens* is not controlling with respect to Mr. Miller's widespread practice theory, because Mr. Miller's complaint includes important additional facts in support of this theory that were lacking from Mr. Owens' complaint.

Inconceivably, the County's motion only references *Owens* once, in footnote 1, which states, "[m]any of the contentions in subsections (A) and (B) were previously made in a motion to dismiss in *Owens v. County of Monroe*, 21-cv-6445FPG." ECF 4-2 p. 4 fn. 1. In fact, large portions of the County's memorandum in this case are copied verbatim from the motion papers in *Owens*.

The County's failure to discuss this Court's decision in *Owens*—which is controlling on the deliberate indifference theory of *Monell* liability—is a blatant violation of Rule 3.3(a)(2) of the New York Rules of Professional Conduct. *Vill. of Freeport & Andrew Hardwick v. Barrella*, 814 F.3d 594, 610 n.60 (2d Cir. 2016) ("We remind counsel that attorneys have an ethical obligation to "disclose to the tribunal controlling legal authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." N.Y. Rules of Prof'l Conduct 3.3(a)(2).[1] That duty of candor extends to an appellant's opening brief.").

For these reasons and the reasons below, the County's motion should be denied.

## Pertinent Facts

On September 25, 2013, at approximately 8:00 p.m., Jack Moseley was robbed at gunpoint on the front steps of the residential center for alcoholics and drug addicts where he was living, located at 19 Roslyn Street, Rochester, New York. ECF 1 ¶ 29. The robber took Mr. Moseley's iPhone from his hand and reached into his pockets and took his keys, two $5 bills and a pack of cigarettes. ECF 1 ¶ 30.

When Jack Mosely was robbed, the Plaintiff, Anthony Miller ("Mr. Miller"), was standing in front of 22 Bradburn Street, Rochester, New York, with his friend Aaron Hinds ("Mr. Hinds"). ECF ¶ 24. Mr. Miller had walked from his home on Birr Street to Bradburn Street to check on his

---

[1] Rule 3.3(a)(2) requires a lawyer to cite authority that is "directly adverse," to the position the lawyer's client is taking, with three important caveats: (1) the lawyer must *know* the authority is "directly adverse," (2) the authority must be in the "controlling jurisdiction," and (3) the authority was not disclosed by opposing counsel. All three elements are met here.

friend Brooklyn Cromes ("Mr. Cromes"), who had been assaulted in the vicinity of 38 Bradburn Street earlier that day on September 25, 2013 at approximately 3:00 p.m. ECF ¶¶ 11-13, 19-21. Upon information and belief, Mr. Cromes was assaulted by one or more members of the "See Set" gang. ECF 1 ¶ 13.

When Mr. Miller arrived at Bradburn Street, he spoke with his friend Mr. Hinds, and they went to stand in front of 22 Bradburn Street, because their friends James and Jarvis Harris lived there and had an open wifi network, and Mr. Miller's cell phone plan had lapsed, so he could only send messages if he was connected to a wifi network. ECF 1 ¶¶ 23-24. Mr. Miller was unable to contact Mr. Cromes on his phone, so he borrowed Mr. Hinds' phone and used it to call Mr. Cromes several times. ECF 1 ¶¶ 26-27.

On September 25, 2013 at approximately 3:05 p.m., RPD officers Jason Prinzi and Daryl Hogg were dispatched to 38 Bradburn Street, and they arrived at approximately 3:45 p.m. ECF 1 ¶ 16. After learning that Mr. Cromes had been taken to Strong Memorial Hospital, Officers Prinzi and Hogg responded to the hospital and spoke with Mr. Cromes about the incident. ECF 1 ¶ 17.

When Jack Mosely was robbed at approximately 8:00 p.m., RPD officers Jason Prinzi and Daryl Hogg responded to the 911 dispatch for the robbery. At approximately 8:04 p.m., RPD officer Andrew Klein arrived at 19 Roslyn and spoke with the victim, then provided the following description of the suspect over the radio: "gray hoodie, jeans and boots, southbound on Genesee towards Sawyer." ECF ¶¶ 40-41. Officer Jason Prinzi then responded over the radio and directed other officers to respond to the area of Millbank and Bradburn Streets, and stated it "could be one of the See Set kids, as the description matches my call from earlier"— Prinzi was referring to the incident where Brooklyn Cromes was assaulted by members of the See Set gang earlier that day. ECF 1 ¶¶ 42-43. At approximately 8:06 p.m., RPD Officer Daryl Hogg responded to Officer Prinzi

and stated, "I'm in that area now." ECF 1 ¶ 44. Immediately thereafter, at approximately 8:07 p.m., RPD Officer Daniel Watson responded over the radio, "likewise." ECF 1 ¶ 45. None of these radio communications were ever disclosed by the prosecution to Mr. Miller or his defense attorney. ECF 1 ¶ 46.

Upon arrival at Millbank and Bradburn, Hogg and Watson immediately stopped and detained Mr. Miller and Mr. Hinds, and Hogg stated to Plaintiff and Mr. Hinds, "what happened over here earlier with Brooklyn. Where's the guns at?" ECF 1 ¶¶ 47-54.

Neither Mr. Miller nor Mr. Hinds matched the description of the robber given to the 911 dispatcher or to the police; instead, they were the first young black men wearing hooded sweatshirts that Hogg encountered. ECF 1 ¶¶ 56-58. Specifically, Mr. Mosely told the 911 dispatcher the gunman was a "thin guy", about 19-20 years old, wearing a gray hoodie and jeans. *Id*. ¶ 37. But when Hogg seized Mr. Miller, he was wearing a red hooded sweatshirt, black wind pants with shorts underneath, and unlaced Timberland boots. *Id*. ¶ 56. Thus, Mr. Miller did not fit the description the victim provided to 911 dispatch. ECF 1 ¶ 57.

Officers Hogg and Daniel Watson frisked Mr. Miller and Mr. Hinds, but did not locate a gun or any of the items that had been stolen from Jack Moseley. *Id*. ¶ 60. Additionally, when they stopped Mr. Miller and Mr. Hinds, there was no objective evidence that they had been running— as they would have had to do to cover the half-mile from 19 Roslyn Street to 22 Bradburn Street in just five minutes. *Id*. ¶ 62.

Immediately after the incident, while Mr. Miller and Mr. Hinds were detained in the back of police cars, a police dog was able to track the scent of the fleeing gunman down Genesee Street, finally losing the scent more than a block south of where the gunman would have needed to turn in order to get to the location on Bradburn Street where Hogg seized and arrested Mr. Miller and

Mr. Hinds. *Id*. ¶ 65. The police dog track never got off Genesee Street, ending at 873 Genesee Street, several blocks south of Bradburn Street. *Id*. ¶ 66.

Nevertheless, the police transported Mr. Miller and Mr. Hinds to 19 Roslyn Street for a show up identification. *Id*. ¶ 71. Mr. Mosely identified Mr. Miller as the gunman, explaining that he must have changed his clothes. *Id*. ¶ 75. Mr. Moseley also identified Mr. Hinds as having been present in the area at the time of the robbery on a bicycle, possibly acting as a lookout, but the police only arrested Mr. Miller. *Id*. ¶¶ 78-79.

Later that night, Mr. Hinds permitted RPD officers to search his home. During the search, none of the items that were taken from the victim were located. Moreover, no other items connecting Mr. Miller or Mr. Hinds to the robbery were located, such as a gun or the clothing the victim stated the robber was wearing. *Id*. ¶ 81.

After Mr. Miller was arrested and while he was in jail, RPD Investigator Nolan Wengert used a global positioning system ("GPS") application called "Find My iPhone" to search for the victim's phone. *Id*. ¶ 82. On September 27, 2013, while Mr. Miller was still in jail, Wengert tracked the phone to a location close to the scene of the crime, where a group of people had congregated. *Id*. The police activated the phone's alarm and, when the alarm sounded, everyone in the group immediately fled. *Id*. The phone was powered down shortly thereafter and never recovered. *Id*.

After the robbery, while Mr. Miller was in jail, Mr. Moseley received three emails from Apple regarding the Find My iPhone application on his stolen phone. *Id*. ¶ 83. These emails were never provided to Mr. Miller or his defense attorney.

At trial, on advice of Counsel, Mr. Miller chose not to put on his own case, and so the only witnesses the jury heard from were the victim and RPD officers, including Hogg, Prinzi, and Investigator Wengert. *Id*. ¶¶ 94-104. Despite the questionable identification of Mr. Miller and the

fact that another individual was found to be in possession of the stolen phone while Mr. Miller was in jail, Mr. Miller was convicted by the jury. *Id* ¶ 105.

Thereafter, on November 13, 2020—just 17 days after oral argument was heard—the Appellate Division, Fourth Department entered its Opinion and Order that reversed Mr. Miller's conviction and dismissed the indictment as against the weight of the evidence. The Fourth Department explained that:

> "there is considerable objective evidence supporting defendant's innocence. Defendant was found standing in a driveway half a mile from the crime scene only seven minutes after it occurred, wearing clothing different from the clothing worn by the gunman. He was not in possession of the fruits of the crime or of a firearm. There was no testimony that he was out of breath or that he displayed other signs of having recently run a distance. To the contrary, his boots were not even laced. The possibility that he changed clothes and hid the items in his companion's residence across the street was questionable in the first instance given the timing of the events, and was severely undercut by the fact that the police obtained permission to search the residence and did so without finding anything linking defendant to the crime. Furthermore, the police investigation established that a person other than defendant possessed the fruits of the robbery, particularly the victim's cell phone, and that person's act in fleeing from the police when the phone alarm sounded was indicative of consciousness of guilt (*see People v. Davis*, 174 A.D.3d 1538, 1540, 108 N.Y.S.3d 84 [4th Dept. 2019], *lv denied* 34 N.Y.3d 980, 113 N.Y.S.3d 656, 137 N.E.3d 26 [2019]; *People v. Zuhlke*, 67 A.D.3d 1341, 1341, 890 N.Y.S.2d 231 [4th Dept. 2009], *lv denied* 14 N.Y.3d 774, 898 N.Y.S.2d 106, 925 N.E.2d 111 [2010]). Other objective evidence, particularly the dog tracking, established that the gunman never turned west off of Genesee Street toward the place where defendant was found, but continued to run down Genesee Street in a southerly direction."

*People* v. *Miller*, 134 N.Y.S.3d 605, 609–10 (4 Dept 2020).

The *Monell* allegations in the Complaint are substantially similar to the *Monell* allegations in the complaint filed by the plaintiff in *Owens v. County of Monroe*, No. 21-CV-6445-FPG. Importantly, however, Mr. Miller's complaint contains critical additional allegations that were not

contained in Mr. Owens' complaint in support of the *de facto* policy theory of municipal liability, at paragraphs 126-131. These paragraphs detail that in 2021, D.A. Sandra Doorley "explicitly acknowledged the existence of MCDAO's unconstitutional policies, practices, and customs of failing to seek out and/or suppressing exculpatory and impeachment *Brady* evidence in comments to the media after MCDAO agreed to vacate and dismiss the weapons possession convictions of Jorge DeJesus Jr. and Ronnie Edmonds." *Id*. ¶ 126.

## <u>LEGAL STANDARDS</u>

### I.     **Motion To Dismiss**

A Rule 12(b)(6) motion must be denied if the complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Arista Records, LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). "[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed '*on the assumption that all the [factual] allegations in the complaint are true*,' [e]ven if their truth seems doubtful." *Anderson News, LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Given that the plausibility requirement '*does not* impose a *probability* requirement at the pleading stage . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

### II.     *Monell* **Liability**

"[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian* v. *Monroe Cty.*, 520 U.S. 781, 784 (1997); *see Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978)*.* A municipality may be held liable under § 1983 and *Monell* for causing, through

a final policymaker's exercise of authority, an individual to suffer a violation of his constitutional rights and for any resulting harm. *Jett* v. *Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989); see also, *Walker* v. *City of New York,* 974 F.2d 293, 301 (2d Cir. 1992); *Bellamy* v. *City of New York*, 914 F.3d 727, 761 (2d Cir. 2019) (Affirming *Walker* line of cases); *Ramos* v. *City of New York,* 285 A.D.2d 284, 303 (1st Dep't 2001) (concluding as "firmly grounded in New York law," the conclusion from *Gentile*, *Walker*, and *Myers* that "where prosecutors, pursuant to policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a conviction, liability rests with the county").

Under *Monell,* "[t]o prevail against a municipality on a § 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline v. Gallo,* 546 F.3d 95, 103 (2d Cir.2008) (internal quotation marks and citation omitted); *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 694. (1978). "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.,* 615 F.3d 129, 140 (2d Cir.2010) (internal quotation marks omitted).

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis* v. *City of New York*, 228 F.Supp.2d 327, 336 (S.D.N.Y.2002), *aff'd,* 75 Fed.Appx. 827 (2d Cir.2003). A plaintiff may satisfy the "policy or custom" requirement by alleging (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that,

although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See Parker* v. *City of Long Beach*, 563 Fed.Appx. 39, 41 (2d Cir.2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick* v. *Erie Cnty. Water Auth.*, 757 F.3d 31, 61–62 (2d Cir.2014) (persistent and widespread practice); *Hines* v. *Albany Police Dep't*, 520 Fed.Appx. 5, 7 (2d Cir.2013) (actions of policymakers); *Schnitter* v. *City of Rochester*, 556 Fed.Appx. 5, 8, 2014 WL 494893, at *2 (2d Cir.2014) (failure to train or supervise); *Missel* v. *County of Monroe*, 351 Fed.Appx. 543, 545 (2d Cir.2009) (formal policy and act of a person with policymaking authority for the municipality).

## <u>Argument</u>

### I.   Defendants Cannot Introduce Extra Pleading Materials To Contradict Facts Pled in the Complaint.

The exhibits that Defendants attach to their motion cannot be considered by the Court. Defendants attach two transcripts from Plaintiff's criminal prosecution to contradict claims in Plaintiff's complaint. But Defendants cannot introduce these extra-pleading materials to contradict the facts pled in the complaint on this Rule 12 motion, as these documents were not integral to Plaintiff's pleading and were not expressly incorporated into his complaint. *Doe* v. *Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010); *McCarthy* v. *Dun & Bradstreet*, 482 F.3d 184, 191 (2nd Cir. 2007); *Roth* v. *Jennings,* 489 F.3d 499, 509 (2d Cir.2007), *quoting Cortec Industries, Inc.* v. *Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991); *see also Sira* v. *Morton,* 380 F.3d 57, 67 (2d Cir. 2004)("A complaint is deemed to include … documents that, although not incorporated by reference, are 'integral' to the complaint.").

Because Mr. Miller's complaint neither attached the transcripts of his criminal trial, nor incorporated them by reference, it was improper for Defendants to attach them to their motion papers. Moreover, as Mr. Miller's criminal case was dismissed and sealed, this is an apparent violation of CPL § 160.50. For these reasons, Plaintiff respectfully submits that in deciding this motion, the Court should disregard the two exhibits and all the arguments in Defendants memorandum that rely on the exhibits.

II.     **Widespread practice and/or *de facto* policy of failing or refusing to seek out, collect, or track exculpatory and impeachment evidence, or, alternatively, of suppressing material exculpatory and impeachment evidence in their possession and control.**

A. **The Court's decision in Owens with respect to a *de facto* policy.**

In *Owens*, the Court held that the complaint did not sufficiently plead a de facto policy based on a widespread practice of prosecutorial misconduct, including withholding of *Brady* materials and presenting misleading evidence and testimony at trial. *Owens v. The Cnty. of Monroe*, No. 21-CV-6445-FPG, at *8 (W.D.N.Y. Dec. 27, 2021).

In *Owens*, the complaint cited approximately 30 cases from the Appellate Division, Fourth Department where the Court either overturned the conviction because of prosecutorial misconduct or admonished prosecutors for committing misconduct but did not reverse the conviction. The Court found that 18 of the cases cited in Mr. Owens' complaint involved misconduct that occurred before his initial trial, and that only seven cases involved brady violations, which occurred over the span of 30 years. *Id*. Additionally, there were five cases cited involving prosecutors eliciting false or misleading testimony, but those cases spanned almost 20 years. *Id*. at *8-9.

Considering these allegations, the Court held,

> Even drawing all inferences in Plaintiff's favor, such a small number of similar instances of misconduct, over the span of multiple decades, does not suggest that the practice is "so widespread as to have the force of law,

> or so manifest as to imply the constructive acquiescence of senior policy-making officials."

*Id.* at *9 (internal citations and quotations omitted).

If Mr. Miller's complaint was limited to the same allegations as Mr. Owens' complaint, then this Court's decision in *Owens* would be controlling here. However, as explained below, Mr. Miller's complaint pleads important additional facts. Thus, Mr. Miller respectfully submits that this Court's decision in *Owens* is not controlling with respect to his *de facto* municipal policy claim based on a widespread practice of prosecutorial misconduct, including the failure to disclose *Brady* materials, and presenting false and misleading evidence and testimony at trial.

**B. Mr. Miller's complaint pleads important additional facts that were not pled in Mr. Owens' complaint, and thus this Court's decision in Owens should not be controlling with respect to the *de facto* policy theory of municipal liability.**

Mr. Miller's complaint pleads more allegations in support of the widespread practice theory of municipal liability than did Mr. Owens' complaint. Mr. Miller's complaint also defines this claim more specifically than did Mr. Owens' complaint, as follows: "In particular, and notwithstanding the Supreme Court's strictures in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, the County and MCDAO maintained a type of "don't ask, don't tell" policy of failing or refusing to seek out, collect, or track any exculpatory or impeachment information not affirmatively provided to prosecutors, or, alternatively, of suppressing material exculpatory and impeachment evidence in their possession and control. These policies, practices, and customs were a direct result of the win at all costs mentality and hostility to *Brady* obligations encouraged and importuned by then final policymaker, current Monroe County District Attorney, Sandra Doorley." ECF 1 ¶ 116.

Mr. Miller's complaint then details allegations in support of this policy that go back to 1985, and details how former District Attorney Howard R. Relin fired Special ADA Louis P.

Pilato—the third ranking ADA in the office and head of the office's investigation unit—in retaliation for Pilato informing Justice Robert Kennedy, the supervising judge of the Monroe County criminal courts, that the ADA handling a murder prosecution was violating the defendants' *Brady* rights. *Id*. ¶ 120. The complaint allges that because Relin was the County policymaker, his decision to fire Pilato constituted an official County policy of retaliation against ADAs for complying with their constitutional obligations under Brady and its progeny, and that the policy has remained unchanged through Mr. Miller's wrongful conviction in 2014 under then (and current) D.A. Sandra Doorly. *Id*. ¶¶ 117–125. Notably, these allegations were included in Mr. Owens' complaint.

Importantly, however, Mr. Miller's complaint then goes on to plead key allegations that were not included in Mr. Owens' complaint:

126.   In 2021—seven years after Plaintiff's trial, and one year after his conviction was reversed—D.A. Doorley even explicitly acknowledged the existence of MCDAO's unconstitutional policies, practices, and customs of failing to seek out and/or suppressing exculpatory and impeachment Brady evidence in comments to the media after MCDAO agreed to vacate and dismiss the weapons possession convictions of Jorge DeJesus Jr. and Ronnie Edmonds.

127.   The reason MCDAO consented to vacate the convictions of Jorge DeJesus Jr. and Ronnie Edmonds was because, much like happened here in Plaintiff's case, MCDAO prosecutors failed to disclose or deliberately suppressed impeachment evidence about two police officers who provided testimony as prosecution witnesses—Ryan Hartley and Robert Osipovitch.

128.   Specifically, in both cases, MCDAO prosecutors either failed to disclose or deliberately suppressed information regarding: (1) a 2011 case where a judge dismissed an indictment after video evidence exposed that both Hartley and Osipovitch lied in sworn testimony and fabricated police reports to justify an unlawful traffic stop of the defendant; (2) another 2011 case where a judge ruled that Osipovitch had crafted and tailored his testimony to try and justify a constitutionally questionable search; and (3) a 2012 case where Hartley claimed to have a search warrant allowing officers to enter a home, which officers did not actually obtain until three hours later.

129.    In her September 2021 comments to the media about the Ronnie Edmonds case, D.A. Doorley explicitly acknowledged that her office had long been aware of the credibility problems with Hartley and Osipovitch, but admitted that MCDAO had never formerly notified defense lawyers about any of the cases where judges found the officers' testimony to be dubious.

130.    D.A. Doorley further acknowledged that, prior to her comments in September of 2021, the MCDAO had no formal processes whatsoever in place for logging or keeping track of impeachment evidence regarding prosecution witnesses, stating, "[n]ow we're formalizing (a process) and maybe better scrutinizing."

131.    Notably, since her September 2021 comments, D.A. Doorley has failed to take any actions to remedy the problem, and MCDAO has failed to implement any formal process whatsoever for logging or keeping track of impeachment evidence regarding prosecution witnesses, or any process that has been implemented is grossly inadequate and nothing more than window dressing.

ECF 1 ¶¶ 126-131.

Footnote 2 in paragraph 128 of Mr. Miller's complaint also cited to and incorporated by reference the article, *See* Gary Craig, *Proof of police dishonesty leads to overturned conviction. Many more could follow*, DEMOCRAT & CHRON. (Sept. 1, 2021, 9:15 a.m.), https://www.democratandchronicle.com/story/news/2021/09/01/proof-of-police-dishonesty-involving-rpd-officers-in-rochester-ny-leads-to-overturned-conviction/5654470001/.

None of the above allegations about D.A. Sandra Doorley (a municipal policymaker) "acknowledg[ing] the existence of MCDAO's unconstitutional policies, practices, and customs of failing to seek out and/or suppressing exculpatory and impeachment *Brady* evidence," nor the Democrat and Chronicle Article, were included in Mr. Owens' complaint.

Notably, in *Vann v. City of Rochester*, No. 6:18-cv-06464(MAT) (W.D.N.Y. Mar. 25, 2019), the late Judge Michael Telesca held that similar allegations that former RPD Chief James Sheppard (also a municipal policymaker) admitting that the RPD maintained an unlawful policy were sufficient to allege a widespread practice claim:

> [T]he Amended Complaint alleges that Sheppard, the former chief of the
> RPD, has admitted in sworn testimony that the RPD has a policy pursuant
> to which RPD officers are instructed to issue dispersal orders to
> individuals lawfully present on public sidewalks and, if the individuals
> fail to display the proper degree of deference or subservience, to arrest
> them on trumped-up "cover charges" such as disorderly conduct, trespass,
> obstruction of governmental administration, and harassment. Am.
> Compl. ¶ 725. The Court offers no opinion on the likelihood that Vann
> will be able to prove this allegation at trial; however, at this motion to
> dismiss stage, the Court is required to accept it as true. Moreover, Vann
> has set forth allegations concerning multiple specific instances wherein
> this policy, practice, or custom was employed by RPD officers in
> performing their policing duties. See id. ¶¶ 726-40. Accordingly, the
> Court finds that dismissal is not warranted on this claim.

*Id.* at *26-27.

Here, the allegations in Mr. Miller's complaint are more like the allegations in *Vann* than

they are to *Owens*. In *Vann*, the reason Judge Telesa held the *Monell* claim was adequately pled

were the allegations that Chief Sheppard had admitted the existence of the policy. Similarly, in

this case, the complaint alleges that D.A. Sandra Doorley has acknowledged the unlawful policy

at issue—allegations that were not contained in Mr. Owens' complaint.

In its motion, the County completely ignores these allegations in Mr. Miller's complaint,

and completely ignores this Court's analysis in *Owens*. Instead, the County's motion simply

copies, nearly verbatim, the arguments advanced in its motion to dismiss in *Owens*.

Mr. Miller respectfully submits that these additional allegations demonstrate that, like the

allegations in *Vann*, his complaint adequately pleads a *de facto* municipal policy claim based on a

widespread practice of prosecutorial misconduct, including the failure to disclose *Brady* materials,

and presenting false and misleading evidence and testimony at trial.

For these reasons, the County's motion to dismiss should be denied, because the complaint

adequately pleads a de facto municipal policy.

**III.    This Court's decision in *Owens* is controlling and demonstrates that Mr. Miller's complaint adequately pleads that the DA's Office was deliberately indifferent to constitutional violations committed by trial prosecutors under a failure to discipline theory of municipal liability.**

In *Owens*, this Court held that the complaint sufficiently pleaded deliberate indifference under a failure to supervise and discipline theory of municipal liability. *Owens v. The Cnty. of Monroe*, No. 21-CV-6445-FPG, at *10-11 (W.D.N.Y. Dec. 27, 2021)

Like Mr. Owens' complaint, Mr. Miller's complaint alleges that in response to records requested pursuant to the Freedom of Information law, the Defendant responded that it has no records of any discipline imposed against any attorney at the DA's Office from January 1, 1998 to 2021; including no records of any discipline of trail prosecutors were found by the Fourth Department to have committed ethical misconduct. ECF 1 ¶¶ 145-146. Moreover Mr. Miller's complaint alleges that since at least 1998, the DA's Office failed to maintain any system or procedures for supervising, overseeing and/or disciplining prosecutors, and failed to investigate even one instance of alleged prosecutorial misconduct. ECF 1 ¶¶ 162-163. As a result, none of the trial prosecutors identified in the approximately 30 decisions issued by the Appellate Division, Fourth Department, where the court either overturned the conviction due to prosecutorial misconduct or admonished the prosecutor for committing misconduct but affirmed the conviction, were ever disciplined as a result of the court's findings. ECF 1 ¶¶ 147-151. The Court ruled in *Owens* that these facts were sufficient to plead *Monell* liability under a deliberate indifference theory, and they are clearly sufficient here as well.

Owens is controlling here, as Mr. Miller's complaint pleads the same allegations in support of this theory, plus additional allegations in support of the theory. Thus, the Court should deny the

County's motion to dismiss Mr. Miller's complaint under a theory of failure to discipline for the same reasons it denied the County's motion in *Owens*.

### IV.    Mr. Miller's complaint adequately pleads that the DA's unlawful policies caused his wrongful conviction.

In his complaint, Mr. Miller identifies two *Brady* violations. First, the radio communications between the RPD officers, in which Officer Prinzi "directed other officers to respond to the area of Millbank and Bradburn Streets and stated it 'could be one of the See Set kids, as the description matches my call from earlier,'" to which Officers Daryl Hogg and Daniel Watson responded and indicated that they would respond to that area. ECF 1 ¶¶ 39-46. These radio communications were never disclosed to Mr. Miller and his defense counsel. ECF 1 ¶ 92.

As detailed below, this constitutes a *Brady* violation because (1) the radio communications could have been used to impeach the RPD officers regarding their reason for responding to Bradburn Street after the robbery, where they stopped and arrested Mr. Miller and Mr. Hinds; and (2) the radio communications would have allowed Mr. Miller to pursue alternative strategies.

The Fourth Department did not mention this *Brady* violation in its decision reversing the conviction, because it was not in the record on appeal. This *Brady* violation was not uncovered until after Mr. Miller was convicted. Thus, the County's argument that there was no *Brady* violation because the Fourth Department did not find that there was a *Brady* violation is meritless.

The second Brady violation was the prosecutor's failure to disclose the Investigative Action Report of Investigator Nolan Wengert, dated September 28, 2013, in which he detailed his use of the Find My iPhone application to track the victim's cell phone to the possession of another individual. ECF 1 ¶¶ 82-83, 89-90. This report was not disclosed by the prosecutor for almost one year, until the eve of trial on September 8, 2014. ECF 1 ¶ 90. "Due to the inordinate delay in

disclosing the Find My iPhone report, Plaintiff and his criminal defense attorney were unable to gather any information from the victim's cell phone carrier or Apple regarding the use of the "Find My iPhone" application, or any other cell phone location data for the victim's cell phone." ECF ¶ 91. As explained below, the complaint adequately pleads that the delay in disclosing the Investigative Action Report constituted a *Brady* violation because the late disclosure prevented Mr. Miller from "us[ing] the information to obtain evidence for use in the trial." *United States v. Rodriguez*, [496 F.3d 221, 226](#) (2d Cir. 2007).

### A. The basic requirements for showing a constitutional *Brady* violation.

"To establish a *Brady* violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material." *See People v. Fuentes*, 12 N.Y.3d 259, 263 (2009); *see People v. Vilardi*, 76 N.Y.2d 67, 74 (1990)("This court has likewise found the prosecution's failure to turn over specifically requested evidence to be 'seldom, if ever, excusable' and to verge on prosecutorial misconduct").

"Evidence is favorable to the accused if it either tends to show that the accused is not guilty or if it impeaches a government witness." *See People v. Garrett*, 23 N.Y.3d 878, 886 (2014); *accord Strickler v. Greene*, 527 U.S. 263, 281-282 & n.21 (1999)("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. . . . Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness"); *U.S. v. Bagley*, 473 U.S. 667, 676 (1985)("Impeachment evidence . . . is evidence favorable to an accused"); *People v. Negron*, 26 N.Y.3d 262, 270 (2015)("this information would have added a little more doubt to the jury's view of the evidence and it is reasonably possible that a little more doubt would have been enough").

Favorable information or evidence is "material" under the federal constitutional due process standard when there is a reasonable probability that, were it disclosed to the defense, the result of the proceeding would be different. A "reasonable probability" is a lower standard than a preponderance of the evidence. It is met when the failure to disclose "undermines confidence" in a conviction. *See Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016); *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Poventud v. City of New York*, 750 F.3d 121, 134 (2d Cir. 2014)(en banc) ("materiality does not depend on factual innocence, but rather what would have been proven absent the violation")

When making the "materiality" determination, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *U.S. v. Agurs*, 427 U.S. 97, 113 (1976); *see also Cone v. Bell*, 556 U.S. 449, 452 (2009)("there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment"); *U.S. v. Mahaffy*, 693 F.3d 113, 134 (2d Cir. 2012)("As close as the trials were, the defendants' assertion, that there is a reasonable probability that they would not have been convicted had the transcripts been disclosed, strikes with particular force"); *People v. Hunter*, 11 N.Y.3d 1, 6 (2008)("We find it reasonably probable that a little more doubt would have been enough"). "[O]nce a reviewing court applying [the *Brady* test] has found constitutional error there is no need for further harmless-error review." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

**B. The County's argument that the failure to disclose Wengert's Investigative Action Report regarding his use of the Find My iPhone application was the fault of the police, and not the prosecutor, is meritless.**

In their motion, the County incorrectly claims that failure to timely disclose Wengert's Investigative Action Report regarding his use of the Find My iPhone application was the fault of the police, not the prosecutor. ECF 4-2 p. 11. This is incorrect under *Brady* and its progeny.

Prosecutors are deemed *strictly liable* for knowing about and disclosing all favorable information and evidence within the possession, custody, or control of law enforcement actors who have participated in the investigation or prosecution of the case. Their "good faith" in failing to disclose favorable information, and/or a lack of cooperation from police officers or other prosecutors who have neglected to alert them to the existence of *Brady* material, are irrelevant. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995)("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. . . . [A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials"); s*ee also Strickler v. Greene*, 527 U.S. 263, 280-81 (1999)("the [*Brady*] rule encompasses evidence known only to police investigators and not to the prosecutor"); *Giglio v. U.S.*, 405 U.S. 150, 154 (1972)("whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."); *People v. Wright*, 86 N.Y.2d 591, 598 (1995)("The mandate of *Brady* extends beyond any particular prosecutor's actual knowledge"); *People v. Simmons*, 36 N.Y.2d 126, 132-33 (1975)("Negligent, as well as deliberate, nondisclosure may deny due process. Good faith, therefore, may not excuse even a negligent failure to disclose unrequested exculpatory evidence where that evidence is highly material to the defense"); *People v. Jackson*, 237 A.D.2d 179, 180 (1 Dept 1997)("The fact that it was the police and not the prosecution which withheld the evidence is immaterial. The good faith of the prosecutor, who was frustrated by the lack of police cooperation, is also immaterial"); *Grievance Comm. for the Tenth Judicial Dist.* v. *Kurtzrock*, 138 N.Y.S.3d 649, 662 (2 Dept 2020)("the respondent [prosecutor] suppressed the materials by his admitted failure to conduct *any Brady* review or analysis of the materials in his possession and to

which he had access. . . . We condemn as well the respondent's actions in purporting to delegate his own ethical obligations to a police detective"); *see also People v. Garrett*, 23 N.Y.3d 878, 887 (2014)("the People may be in 'constructive' possession of information known to government officials who engaged in a joint or cooperative investigation of the defendant's case"); *U.S. v. Meregildo*, 920 F.Supp.2d 434, 440-43 (S.D.N.Y. 2013)(collecting federal cases regarding which individuals or agencies are part of the "prosecution team" under *Brady/Kyles*).

    **C.  The prosecutor's failure to timely disclose Wengert's Investigative Action Report constituted a *Brady* violation because it deprived Mr. Miller of an opportunity to obtain evidence regarding the victim's cell phone for use in the trial.**

The Second Circuit has explained that "*Brady* information must be disclosed . . . in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial" and "[t]hus, the Government must make disclosures in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).

Courts have specifically held that where the late disclosure of records relating to a cell phone deprived the defendant of the opportunity to investigate those records, the prosecution violated their *Brady* obligations. *U.S. v. Garner*, 507 F.3d 399, 405 (6th Cir. 2007)("The failure of the government to turn over the [cell phone] records within a time frame that would allow Garner's counsel to investigate them prejudiced defendant"); see *People v. Casalino*, 204 A.D.3d 1078 (N.Y. App. Div. 2022) (late disclosure of cell phone records caused mistrial); see also, *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use."); *Nnodimele v. DeRienzo*, 13-CV-3461 (ARR)(RLM), at *35 (E.D.N.Y. Jan. 27,

2016) ("That opportunity for use is defined as "the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought."")

Here, the delay in disclosing the Investigative Action Report was a *Brady* violation because it prevented Mr. Miller and his defense attorney from "us[ing] the information to obtain evidence for use in the trial." *Id*. Indeed, "[d]ue to the inordinate delay in disclosing the Find My iPhone report, Plaintiff and his criminal defense attorney were unable to gather any information from the victim's cell phone carrier or Apple regarding the use of the "Find My iPhone" application, or any other cell phone location data for the victim's cell phone." ECF 1 ¶ 91.

Additional information about Investigator Wengert's use of the Find My iPhone application was not revealed until the trial was underway, where it was revealed that the victim had provided Wengert three emails from Apple regarding the "Find My iPhone" application and the location of his stolen phone, which were provided to Wengert – but never disclosed to the defense. ECF 1 ¶ 103. It was also revealed that after using the Find My iPhone application to track the phone to the area of Genesee Street and West High Terrace, and activating the alarm function, no further efforts were made to locate the phone or determine if any other person was involved in the robbery. ECF 1 ¶¶ 103-105.

If the Investigative Action Report had been timely disclosed, Mr. Miller and his criminal defense attorney could have subpoenaed the victim's cell phone carrier or Apple for GPS location data on the night of the incident and thereafter. They could have also pursued alternative strategies, like hiring a private investigator to try and locate the phone or identify the actual perpetrator. Thus, the one year delay in disclosing Wengert's IAR violated Mr. Miller's *Brady* rights.

**D. The prosecutor's failure to disclose the RPD Officers' radio communications constituted a *Brady* violation because they could have been used to impeach the RPD officers and they would have provided the defense with alternative strategies.**

In their motion, the County devotes just one sentence to addressing Mr. Miller's claim that the prosecutor's failure to disclose the RPD officers' radio communications constituted a *Brady* violation, stating, "[t]he complaint does not sufficiently explain how the 911/radio calls constitute *Brady* material, or how they were material in that there was a reasonable probability that the outcome of the trial would have been different. *See United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998)." ECF 4-2 p. 11.

But the materiality of the radio communications is self-evident, considering the totality of the allegations in the complaint. *U.S. v. Bagley*, 473 U.S. 667, 683 (1985)("The reviewing court should assess the possibility that such effect [i.e., a reasonable probability of a different outcome] might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.")

Specifically, the prosecutor's failure to disclose the radio communications constituted a *Brady* violation, because they (1) would have provided a basis to impeach the officers for their reason in responding to Bradburn Street; and (2) would have provided alternative defense strategies. Moreover, because the evidence of Mr. Miller's guilt was not overwhelming, the failure to disclose the radio communications was not harmless.

It is clearly established that where "there is a reasonable probability that the undisclosed evidence might have led to a trial strategy that resulted in a different outcome," failure to disclose the evidence constitutes a *Brady* violation. *People v. Vilardi*, 76 N.Y.2d 67, 78 (1990); *Kyles v. Whitley*, 514 U.S. 419, 445-47 (1995)("[the informant] Beanie's various statements would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the

investigation"); *see also Graves v. Dretke*, 442 F.3d 334, 344 (5th Cir. 2006)("If the two statements had been revealed, the defense's approach could have been much different"); *People v. Ulett*, 33 N.Y.3d 512, 521 (2019)("The video would also have provided . . . avenues for alternative theories for the defense"); *People v. Smith*, 127 A.D.2d 864, 866 (2d Dept. 1987)("At the very least, the defendant was deprived of the opportunity to make an informed decision regarding the trial strategy that would have been in his best interests to pursue, which must be considered in this case to have deprived him of a fair trial").

Moreover, Mr. Miller need not demonstrate that the outcome of the trial would have been different had the radio communications been disclosed, just that he was deprived of a fair trial because of their suppression. As the Second Circuit has explained, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but *whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.*" *Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (internal citations and quotations omitted).

Here, Mr. Miller did not receive a fair trial, as the Fourth Department held that the verdict rendered was not worthy of confidence even without knowing of the withheld radio communications. *People* v. *Miller*, 134 N.Y.S.3d 605, 609 (4 Dept 2020) (holding there was "considerable objective evidence supporting defendant's innocence").

The prosecutor's failure to disclose the RPD's radio communications clearly constituted a *Brady* violation. First, the radio communications could have been used to impeach Officer Hogg at trial, where he testified that he randomly chose to respond to Bradburn Street and that he stopped and seized the first young black man in a hooded sweatshirt that he found, Mr. Miller. ECF 1 ¶¶ 97-98.  The radio communications could have been used by defense counsel to impeach Hogg's

claim that he randomly chose to explore that street and demonstrate that the true reason he responded to Bradburn Street was because of Officer Prinzi's direction over the radio. The fact that he responded to Bradburn Street at the direction of Officer Prinzi further explains why he stopped and arrested Mr. Miller and Mr. Hinds, even though they did not match the description of the perpetrator that the victim provided to the 911 dispatcher.

The radio communications could have also been used on cross examination of Investigator Wengert, who testified that "he interviewed Plaintiff at the police station on the night of the incident, and Plaintiff told him that he had walked across the City from his home on Birr Street to Bradburn Street to check on his friend Brooklyn Comes. However, Wengert did not disclose that Officers Hogg and Prinzi had responded earlier that day to the area of Millbank and Bradburn Streets to investigate the assault on Brooklyn Cromes, and that they had spoken with Mr. Cromes at Strong Memorial Hospital." ECF 1 ¶ 102. The radio communications could have been used on cross examination of Wengert to verify that the police knew that Mr. Cromes had been assaulted on Bradburn Street earlier that day, and that that was the reason for responding back to Bradburn Street when they stopped and arrested Mr. Miller and Mr. Hinds.

Second, the radio communications were *Brady* material because they would have provided a basis for several alternative defense strategies. *People v. Smith*, 127 A.D.2d 864, 866 (2d Dept. 1987)("At the very least, the defendant was deprived of the opportunity to make an informed decision regarding the trial strategy that would have been in his best interests to pursue, which must be considered in this case to have deprived him of a fair trial"). If the radio communication had been timely disclosed, this would likely have led to additional discovery regarding the incident that Officer Prinzi referenced in the radio communication—namely, the assault of Mr. Miller's friend, Brooklyn Cromes, and the fact that Officers Hogg and Prinzi had responded to Bradburn

Street earlier in the day on September 25, 2013 to investigate the incident, and that they had also gone to Strong Memorial Hospital to speak with Mr. Cromes about the assault. ECF 1 ¶¶ 16-17, 99, 102. None of this information was disclosed during the criminal prosecution.

Moreover, at the advice of counsel, Mr. Miller chose not to testify at his criminal trial, and they did not call his alibi witness, Aaron Hinds, to testify either. But the reason he was present on Bradburn Street that day was because his friend Brooklyn Cromes had been assaulted, and he went there to try and found out what happened to Mr. Cromes and if he was okay.

If the radio communications had been disclosed, Mr. Miller could have drawn the connection between the reason for his presence on Bradburn Street and the reason why Officers Hogg and Watson responded to Bradburn Street—the assault of his friend, Brooklyn Cromes. The radio communications corroborated and bolstered Mr. Miller's explanation, and if this information had been disclosed, Mr. Miller and his defense counsel may have pursued a completely different trial strategy—they may have decided that Mr. Miller and his alibi witness Aaron Hinds should testify to explain that when they were stopped and arrested by the police, Plaintiff was attempting to call Brooklyn Cromes from his own cell phone and Mr. Hinds cell phone.

Moreover, the failure to disclose the radio communications as not harmless. The radio communications were clearly material, because "the verdict [was] already of questionable validity," and so this "additional evidence" even if it was only viewed as constituting "relatively minor importance might [have been] sufficient to create a reasonable doubt" that changed the outcome of the trial. *See U.S. v. Agurs*, 427 U.S. 97, 113 (1976).

## **CONCLUSION**

For the reasons herein, Mr. Miller respectfully submits that the County's Rule 12(b)(6) motion should be denied, and he should be permitted to proceed to discovery to prove his claims.

25

Dated: New York, New York                Respectfully Submitted,
   February 16, 2024                ROTH & ROTH LLP


        By: _____ ~/s/~ _____
         Elliot Dolby Shields, Esq.
         *Attorneys for Plaintiff*
         192 Lexington Ave, Suite 802
         New York, New York 10016 Ph:
         (212) 425-1020


To:  (all parties via ECF)